## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ILLUMINA, INC.,                          )
                                         )
    Plaintiff,                       )
                                         )
    v.                               )          Civil Action No. 22-334-GBW-CJB
                                         )
GUARDANT HEALTH, INC.; HELMY             )
ELTOUKHY and AMIRALI TALASAZ,            )
                                         )
    Defendants.                      )

## REPORT AND RECOMMENDATION

In this case, Plaintiff Illumina, Inc. ("Plaintiff" or "Illumina") brings correction of inventorship, trade secret misappropriation and breach of contract claims against Defendants Guardant Health, Inc. ("Guardant"), Helmy Eltoukhy ("Eltoukhy") and AmirAli Talasaz ("Talasaz" and collectively with Guardant and Eltoukhy, "Defendants").[1]  Pending before the Court is Defendants' motion to dismiss Illumina's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6) (the "Motion").  (D.I. 29)  For the reasons set forth below, the Court recommends that the motion to dismiss be GRANTED-IN-PART and DENIED-IN-PART.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff Illumina is a Delaware corporation with its principal place of business in San Diego, California.  (D.I. 1 at ¶ 4)  The company was founded in 1998 by scientists studying the

---

[1]      Eltoukhy and Talasaz will at times be referred to herein as the "Individual Defendants."

mapping of the human genome, and it develops and manufactures tools and integrated systems for genetic analysis.  (*Id.* at ¶¶ 5-6)

Defendant Guardant is a Delaware corporation with its principal place of business in Redwood City, California.  (*Id.* at ¶ 10)  Guardant develops and markets blood-based cancer detection tests.  (*Id.*; *see also* D.I. 30 at 1, 4)

Guardant was founded by Defendants Eltoukhy and Talasaz, two former Illumina employees who are both residents of California.  (D.I. 1 at ¶¶ 3, 11-13)  On December 9, 2011, while still employed by Illumina, Eltoukhy and Talasaz anonymously incorporated Guardant in Delaware.  (*Id.* at ¶¶ 15, 26)  Talasaz worked at Illumina from 2009 until June 2012 and Eltoukhy worked there from 2008 until January 2013.  (*Id.* at ¶¶ 17, 28, 31)  Upon leaving their employment at Illumina, both men immediately became employed by Guardant—Talasaz in June 2012 and Eltoukhy in January 2013.  (*Id.* at ¶¶ 28-30, 63-64)  However, while Eltoukhy was still employed at Illumina, he worked with Talasaz on Guardant projects and technologies, and acted as a corporate agent and fiduciary of Guardant.  (*Id.* at ¶¶ 32-38)  Eltoukhy is now the Chief Executive Officer of Guardant, and Talasaz is the Chief Operating Officer of Guardant.  (*Id.* at ¶¶ 12-13)

While at Illumina, Eltoukhy and Talasaz agreed to and were bound by employment agreements and company policies, which required them to:

> devote their efforts to Illumina's business, to not compete with Illumina, to avoid conflicts of interest that could compromise their loyalty to Illumina, to assign to Illumina their inventions made while employed by Illumina that are related to Illumina's business, to protect Illumina's confidential and proprietary information, to not take or use Illumina's resources and property for their personal benefit, and to return Illumina materials to the company upon termination of their employment.

(*Id.* at ¶ 19)  These employment agreements and company policies included:  (1) a Proprietary Information and Invention Agreement ("PIIA"); (2) Confidentiality—Disclosure on Need-To-Know Basis Only Acknowledgement ("Confidentiality Acknowledgment"); (3) Code of Ethics; and (4) a Termination Certificate at the end of their employment.  (*Id.* at ¶ 18)

The Complaint alleges that while still employed at Illumina, Eltoukhy and Talasaz accessed Illumina's confidential information and resources relating to "Illumina's proprietary error correction methods, cell-free DNA, copy number variations, next-generation sequencing, and communication theory."  (*Id.* at ¶ 22; *see also id.* at ¶¶ 2, 24-25)  For example, it is alleged that during the second half of 2012, Eltoukhy, while still employed at Illumina, forwarded Illumina's confidential information to his personal e-mail account and to Talasaz; Eltoukhy and Talasaz then allegedly used this confidential information to develop Guardant's patent portfolio, including 35 patents that are assigned to Guardant.[2]  (*Id.* at ¶¶ 40-50, 53)  The confidential

---

[2]    The 35 patents at issue consist of three patent families.  (*See* D.I. 30 at 8 n.2; Tr. at 178)  The first patent family (the "'127 patent family") includes 19 of the 35 patents:  U.S. Patent Nos. 10,041,127 ("the '127 patent"); 9,598,731 ("the '731 patent"); 9,834,822 ("the '822 patent"); 9,840,743 ("the '743 patent"); 10,837,063 ("the '7063 patent"); 10,457,995 ("the '995 patent"); 10,494,678 ("the '678 patent"); 10,501,808 ("the '808 patent"); 10,501,810 ("the '810 patent"); 10,683,556 ("the '556 patent"); 10,738,364 ("the '364 patent"); 10,793,916 ("the '916 patent"); 10,822,663 ("the '663 patent"); 10,961,592 ("the '592 patent"); 10,876,171 ("the '171 patent"); 10,876,172 ("the '172 patent"); 10,947,600 ("the '600 patent"); 10,995,376 ("the '376 patent") and 11,001,899 ("the '899 patent").

The second patent family (the "'992 patent family") includes nine of the 35 patents:  U.S. Patent Nos. 9,902,992 ("the '992 patent"); 10,894,974 ("the '974 patent"); 10,876,152 ("the '152 patent"); 10,704,086 ("the '086 patent"); 10,704,085 ("the '085 patent"); 11,091,797 ("the '797 patent"); 10,870,880 ("the '880 patent"); 10,982,265 ("the '265 patent") and 11,091,796 ("the '796 patent").

The third patent family (the "'366 patent family") includes seven of the 35 patents:  U.S. Patent Nos. 9,920,366 ("the '366 patent"); 10,883,139 ("the '139 patent"); 10,801,063 ("the '1063 patent"); 10,889,858 ("the '858 patent"); 11,118,221 ("the '221 patent"); 11,149,306 ("the '306 patent") and 11,149,307 ("the '307 patent").  (D.I. 1 at ¶ 50; D.I. 30 at 8 n.2)

Illumina information included a slide presentation relating to "error rate improvements and communication theory ideas" on how to decode barcodes more effectively (the "communication theory slides"); Eltoukhy requested and obtained these slides on June 27, 2012 from another Illumina employee, Frank Steemers, who at the time was a senior director and researcher working on sequencing technology for Illumina. (*Id.* at ¶¶ 40-48)

The Complaint also alleges that while still employed by Illumina, Eltoukhy drafted and revised patent claims for Guardant using Illumina's computers. (*Id.* at ¶ 54) On December 15, 2012, Eltoukhy e-mailed draft patent claims dated August 10, 2012 to his personal Gmail account from his Illumina work e-mail account. (*Id.* at ¶ 55)

And the Complaint asserts that when Eltoukhy left his employment at Illumina, he took various Illumina documents with him. More specifically, it states that Eltoukhy appropriated more than 51,000 emails from Illumina, including more than 1,400 documents that were labeled "'COMPANY CONFIDENTIAL—INTERNAL USE ONLY.'" (*Id.* at ¶¶ 65-66)

Eltoukhy is alleged to have taken various steps to conceal the fact that he was transferring Illumina's confidential information outside of the company. One such example referenced in the Complaint is Eltoukhy's use (referenced above) of his personal, non-Illumina e-mail address to transfer Illumina confidential information to Guardant. (*Id.* at ¶ 69) Another relates to the application that later issued as the '743 patent; that application, filed on March 23, 2017, listed both Eltoukhy and Talasaz as inventors. (*Id.* at ¶¶ 72-73) However, Eltoukhy's name as an inventor was removed from the application on October 27, 2017. (*Id.* at ¶ 74)

Illumina alleges that it did not learn of any of Defendants' wrongful conduct until at least in or around June 2019. In that month, Illumina became aware of some of the above-referenced misconduct in the course of responding to third-party discovery requests that were served on it in

a patent litigation that Guardant had filed in this District against Foundation Medicine, Inc. (*Guardant Health, Inc. v. Foundation Medicine, Inc.*, Civil Action No. 17-1616-LPS-CJB (D. Del.)) and Personal Genome Diagnostics (*Guardant Health, Inc. v. Personal Genome Diagnostics, Inc.*, Civil Action No. 17-1623-LPS-CJB (D. Del.)) (collectively, the "FMI litigation").  (*Id.* at ¶¶ 75-78)

Thereafter, between August and November 2019, Eltoukhy's name as an inventor was removed from more Guardant patent applications on which he was originally named as an inventor (these applications issued as the '995 patent, the '808 patent, the '152 patent and the '7063 patent.  (*Id.* at ¶ 79)  And after being deposed in the FMI litigation on April 8, 2019, Eltoukhy is alleged to have deleted or attempted to delete confidential Illumina documents from his personal files.  (*Id.* at ¶ 80)

Additional relevant factual allegations will be discussed below in the appropriate portions of Section II.

**B.    Procedural Background**

On March 17, 2022, Illumina filed its Complaint in this case.  (D.I. 1)  The Complaint contains four Counts:

- Count I:  Declaratory Judgment to Correct Inventorship and Ownership under 35 U.S.C. § 256.  (*Id.* at ¶¶ 84-102)

- Count II:  Misappropriation of Illumina Trade Secrets Under California's Uniform Trade Secrets Act ["CUTSA"], Cal. Civ. Code § 3426 *et seq*. against all Defendants.  (*Id.* at ¶¶ 103-20);

- Count III:  Breach of Contract against Eltoukhy.  (*Id.* at ¶¶ 121-31); and

- Count IV:  Breach of Contract against Talasaz.  (*Id.* at ¶¶ 132-42)

On May 25, 2022, Defendants filed the Motion.  (D.I. 29)  Briefing on the Motion was completed on July 20, 2022.  (D.I. 45)  On September 12, 2022, United States District Judge Gregory B. Williams referred this case to the Court to hear and resolve all pre-trial matters up to and including expert discovery matters (but not including summary judgment motions, *Daubert* motions, pre-trial motions in limine or the pre-trial conference).  (D.I. 62)  The Court heard oral argument on the Motion on December 9, 2022.  (D.I. 83 (hereinafter, "Tr."))

## II.   DISCUSSION

In the portions of its Motion filed pursuant to Rule 12(b)(6), Defendants argue, for various reasons, that each of Counts I-IV should be dismissed.  The Court will address those Rule 12(b)(6) arguments first.  Thereafter, the Court will take up the portion of Defendants' Motion in which they argue, pursuant to Rule 12(b)(2), that Counts II, III and IV should be dismissed against the Individual Defendants for lack of personal jurisdiction.

### A.   Defendants' Arguments for Dismissal Pursuant to Rule 12(b)(6)

#### 1.   Legal Standard

The sufficiency of pleadings for non-fraud claims is governed by Rule 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  If a Rule 12(b)(6) movant asserts that the plaintiff's complaint fails to plead sufficient facts necessary to set out a plausible claim, then the reviewing court conducts a two-part analysis.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Id.* at 210-11.  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has

a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).[3] In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Id.* at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

### 2. Discussion

Having set out the relevant legal standard, the Court will now address Defendants' Rule 12(b)(6) arguments as to Illumina's inventorship, trade secret misappropriation and breach of contract claims in turn.

### a. Has Illumina Sufficiently Pleaded its Inventorship Claim Under 35 U.S.C. § 256?

In Count I of the Complaint, Illumina alleges that the inventorship of the 35 patents should be corrected under 35 U.S.C. § 256 ("Section 256"), such that Eltoukhy and/or Steemers should be added as co-inventors on the 35 patents,[4] and that Illumina should be recognized as at least a co-owner of those patents (in light of the fact that Eltoukhy and Steemers would have then

---

[3]       In resolving a motion to dismiss, a court typically only considers the allegations in the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the court can take judicial notice.  *See Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012); *ING Bank, fsb v. PNC Fin. Servs. Grp., Inc.*, 629 F. Supp. 2d 351, 354 (D. Del. 2009).

[4]       More specifically, Illumina alleges that:  (1) Eltoukhy should be named as a joint inventor of all patents in the '127 patent family; of eight of the nine patents in the '992 patent family (all but the '992 patent); and of one patent from the '366 patent family (the '858 patent); and (2) Steemers should be named as a joint inventor of the patents making up all three patent families.  (D.I. 1 at ¶ 143(A)-(C))

been obligated to assign their patent rights to Illumina) (the "inventorship claim").[5]  (D.I. 1 at ¶¶ 98-102)  Defendants argue that Illumina's inventorship claim fails because:  (1) Illumina's allegations relating to Eltoukhy and Steemers' contributions to the 35 patents are too vague and conclusory to plausibly plead an inventorship claim; and (2) Illumina has failed to sufficiently plead that it has an ownership interest in the patents, and thus it lacks Article III standing to challenge inventorship of the 35 patents.[6]  (D.I. 30 at 8-16; D.I. 45 at 1-5)

---

[5]     Illumina's Complaint also seeks an order requesting the correction of inventorship with respect to nine patent applications "if issued as patents[.]"  (*Id.*)  Defendants argue that any part of Count I that relates to a request to correct inventorship on these patent applications should be dismissed, because a claim for correction of inventorship pursuant to Section 256 does not accrue until the patent issues (and thus any claims pertaining to patent applications are not yet ripe).  (D.I. 30 at 16-17; Tr. at 202); *see also Hor v. Chu*, 699 F.3d 1331, 1335 (Fed. Cir. 2012) ("A [Section] 256 claim for correction of inventorship does not accrue until the patent issues."); *Display Rsch. Labs., Inc. v. Telegen Corp.*, 133 F. Supp. 2d 1170, 1173 (N.D. Cal. 2001) (explaining that Section 256 is inapplicable to patent applications and that "any claims made thereunder based on patents that may issue are speculative and not ripe for review").  Illumina retorts that it does not intend to currently press a claim in Count I relating to these patent applications, and that it referenced the applications in the Complaint only to note that it would seek relief on them if they later issue as patents.  (D.I. 41 at 21; Tr. at 196-97)  The Court agrees with Defendants that it is not appropriate to keep any such claims pending "such that they would spring to life if and when Guardant's patents are issued[.]"  (D.I. 45 at 2 n.2)  The Court therefore recommends that the portions of paragraph 143(A)-(C) of the Complaint referring to the patent applications be STRICKEN.  *See, e.g., Kirchner v. Wyndham Vacation Resorts, Inc.*, 580 F. Supp. 3d 57, 65-66 (D. Del. 2022) (striking portion of an improper allegation in resolving a motion to dismiss).

[6]     Defendants' standing argument implicates Rule 12(b)(1), which authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring its claim.  Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the court's subject matter jurisdiction.  *See Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 257 (3d Cir. 2009)).  In reviewing a facial challenge under Rule 12(b)(1), which is at issue here, the same standards relevant to Rule 12(b)(6) apply.  In this regard, the court must accept all factual allegations in the complaint as true, and the court may only consider the complaint and documents referenced in or attached thereto.  *Id.*; *see also Church of Univ. Brotherhood. v. Farmington Twp. Supervisors*, 296 F. App'x 285, 288 (3d Cir. 2008).

Section 256 "provides a cause of action to interested parties to have the inventorship of a patent changed to reflect the true inventors of the subject matter claimed in the patent." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997). A complaint alleging a Section 256 correction of inventorship claim under a joint inventorship theory must allege that each "joint inventor . . . contribute[d] to the invention's conception." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1358 (Fed. Cir. 2019); *Fina Oil*, 123 F.3d at 1473 ("[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention."). However, a joint inventor need not "make the same type or amount of contribution" to the invention nor contribute to every claim; a contribution to one claim is enough. *CODA*, 916 F.3d at 1358 (internal quotation marks and citations omitted); *see also Vanderbilt Univ. v. ICOS Corp.*, 601 F.3d 1297, 1303 (Fed. Cir. 2010) ("[E]ach contributor need not have their own contemporaneous picture of the final claimed invention in order to qualify as joint inventors."). There is no "explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor." *Fina Oil*, 123 F.3d at 1473. Rather, a joint invention is the product "of a collaboration between two or more persons working together to solve the problem addressed." *Id.*; *see also Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("Joint inventorship . . . can only arise when collaboration or concerted effort occurs—that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts[.]"). A joint inventor must "do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *In re VerHoef*, 888 F.3d 1362, 1366 (Fed. Cir. 2018) (citation omitted).

Inventorship of a patent is a distinct concept from ownership of a patent. *Beech Aircraft Corp. v. EDO Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). While inventorship concerns who actually invented the subject matter claimed in a patent, ownership is a "question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property." *Id.* Even so, "[a]t the heart of any ownership analysis lies the question of who first invented the subject matter at issue, because the patent right initially vests in the inventor who may then, barring any restrictions to the contrary, transfer that right to another[.]" *Id.* To sufficiently plead a cognizable injury for an inventorship claim pursuant to Section 256, a plaintiff must allege facts establishing that it has expected ownership rights or a "concrete financial interest" in the patent at issue. *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1326 (Fed. Cir. 2009); *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1358-59 (Fed. Cir. 2001).

The Court will first assess Illumina's inventorship claim with respect to Steemers, and will then turn to the claim as it relates to Eltoukhy.

### i.    Illumina's inventorship claim with respect to Steemers

The Court agrees with Defendants that Illumina's assertion that Steemers should be added to the 35 patents as a joint inventor is insufficiently pleaded. (D.I. 30 at 12; D.I. 45 at 3) The Complaint broadly alleges that Steemers contributed "novel concepts and work" to the inventions of all 35 patents that "include, for example, applications of error correction methods and communication theory ideas, including in grouping sequence reads into families and then collapsing those reads into a single consensus sequence from the sequence reads in the families." (D.I. 1 at ¶ 90) The Complaint's only factual support for this allegation is that in response to a request from Eltoukhy for a "specific presentation . . . concerning random coding improvement in error rate for use in genetic sequencing to obtain better accuracy from fewer sequence

10

reads[,]" Steemers provided Eltoukhy with the communication theory slides—slides that are not attached to the Complaint—"relating to [] error rate improvements and communication theory ideas." (*Id.* at ¶¶ 41, 46)[7]  But importantly, it is not at all clear from the Complaint that *Steemers himself* generated whatever ideas may be reflected in the slides.  (Tr. at 144)  Instead, the Complaint vaguely alleges that the slides reflected "years of novel work by *Illumina personnel*, including valuable methods and data that *Illumina personnel* had created[.]"  (D.I. 1 at ¶ 48 (emphasis added))  These slides were generated at Illumina; presumably Illumina knows whether it was Steemers (or instead some other Illumina employee(s)) who contributed to the concepts discussed in the slides.  (Tr. at 190-91)[8]  But the Complaint does not clearly assert that it was

---

[7]      Because the communication theory slides were not attached to the Complaint and are not described in great detail in the Complaint, it is difficult for the Court to assess (based on the information of record that it can rely on here) what content is actually found in these slides. However, later in paragraph 57, the Complaint alleges that Eltoukhy obtained confidential material from Illumina employees such as "Illumina's confidential and proprietary error correction methods and communication theory ideas, including methods for grouping sequence reads into families and then collapsing those reads into a single consensus from the sequence reads in the families." (D.I. 1 at ¶ 57)  This allegation (about "confidential material" that Eltoukhy "obtained" from Illumina employees) must in part be a reference to Eltoukhy's efforts to obtain the communication theory slides from Steemers.  With that in mind, and considering the allegations regarding the types of contributions that Steemers allegedly made to the patents, the Court can conclude that the information described in paragraph 57 is meant to reference, at minimum, at least some of the content of the communication theory slides.  (*Id.* at ¶¶ 41, 90; *see also id.* at ¶¶ 58-59, 61; D.I. 30 at 19 n.9; Tr. at 198)  Put differently, in light of the above, the Complaint plausibly alleges that the communication theory slides include at least some content regarding "methods for grouping sequence reads into families and then collapsing those reads into a single consensus sequence from the sequence reads in the families."

[8]      During oral argument, Illumina's counsel came close to suggesting that it may *not* have been Steemers who created/contributed to these slides—or at least that Illumina may *not be sure* whether it was Steemers or some other Illumina employee(s) who did so.  (Tr. at 189-90 (Illumina's counsel stating "Your Honor, our point was that an Illumina employee created those slides. . . . or contributed to them.  That Illumina employee would be the contributor to the claimed invention through the process that we've talked about.  We believe and we think the reasonable inference is Steemers made contributions to [the slides,] and on that ground is a joint inventor.  But the reason for that language in the briefing was [that] if it turned out to be the case that it was someone else who[ is] an Illumina employee, the analysis would be no different."))

Steemers that did so.  The Complaint therefore fails to state a claim that *Steemers* contributed to the conception and reduction to practice of the 35 patents and that he should in turn be named as a joint inventor on those patents.  *Cf. Intel Corp. v. Tela Innovations, Inc.*, Case No. 3:18-cv-02848-WHO, 2019 WL 2476620, at *6 (N.D. Cal. June 13, 2019) (rejecting the defendant's argument that the plaintiff's joint inventorship claim should fail because, *inter alia*, the complaint "does not clarify that the technology shared at the meeting was Pileggi's invention rather than another Fabbrix employee's[,]" because an allegation in the complaint "specifically calls it 'Professor Pileggi's technology'"). [9]

The Court further concludes that the inventorship claim with respect to Steemers fails for an additional reason:  the Complaint does not plausibly allege facts relating to Steemers that indicates how Illumina owns or co-owns the patents-at-issue.  Thus, Illumina has not plausibly articulated how it has Article III standing to challenge the inventorship of the 35 patents in light of Steemers' alleged contributions thereto.  (D.I. 30 at 13-16; D.I. 45 at 5; Tr. at 171-72)

In this regard, the Complaint asserts in only conclusory fashion that Illumina should be declared co-owner of the 35 patents based on "Steemers' assignments to Illumina[.]"  (D.I. 1 at ¶¶ 100, 102)  Yet while the pleading otherwise clearly states that *Eltoukhy and Talasaz* entered into certain employment contracts that, *inter alia*, required that they assign to Illumina certain

---

But if some other Illumina employee were responsible for conceiving of the content of these slides, then it would be that unidentified Illumina employee who should be named as a co-inventor of the patents, not Steemers (as the Complaint alleges).

[9]    In its briefing, Defendants also argue that it is not clear from the Complaint how Steemers can be said to have *collaborated* with either Eltoukhy (assuming that Eltoukhy was in fact a co-inventor) or Talasaz to come up with any contributions to the 35 patents at issue.  (D.I. 30 at 12; D.I. 45 at 3; Tr. at 144-45)  But with the Complaint failing to plausibly allege Steemers' co-inventorship on other grounds, the Court need not resolve this issue.

inventions they created while employed by Illumina, there are no clear factual allegations that *Steemers* executed any such assignment agreements.  (*Id.* at ¶ 19; *see also* Tr. at 172, 197-98)[10] Thus, Illumina has not sufficiently alleged that it has an ownership interest in the 35 patents via any act of or any connection with Steemers.  Consequently, Illumina has not demonstrated standing to assert ownership over any patents that may include contributions made by Steemers. *See Blackhawk Network Inc. v. SL Card Co. Inc.*, 589 F. Supp. 3d 1115, 1128 (D. Ariz. 2022) ("[T]he Complaint contains no allegation that the employees assigned their putative rights in Defendants' patents to Blackhawk.  Absent such an allegation, Blackhawk is unable to demonstrate that *it* has a concrete interest in the Patents, even if its employees do.") (emphasis in original) (citing cases), *amended on reconsideration on other grounds*, No. CV-21-00813-PHX-MTL, 2022 WL 1136633 (D. Ariz. Apr. 18, 2022).

### ii.     Illumina's inventorship claim with respect to Eltoukhy

Next, the Court assesses Illumina's inventorship claim as it relates to Eltoukhy. Defendants' first argument here is that the Complaint (1) "makes only conclusory assertions describing Dr. Eltoukhy's contributions, and even then, only in reference to seven claims of the 178 claims in seven of the patents in the '127 and '992 Patent Families"; but (2) says "nothing at all (conclusory or otherwise) about Dr. Eltoukhy's contributions as to the other patents in those families."  (D.I. 30 at 10; *see also* D.I. 45 at 2 (Defendants arguing that the 28 patents that "Illumina fails to address at all should be dismissed" and that, for the seven patents it does address, "Illumina fails to identify any non-conclusory allegations showing *inventive* contributions by [] Eltoukhy") (emphasis in original))  This raises the question of what must a

---

[10]     Again, these are Illumina's employment agreements.  So presumably Illumina would be in a position to know which of their employees signs what type of agreement, and whether and why it is plausible that any particular employee (here, Steemers) did so in the past.

plaintiff plead in a complaint to plausibly establish that a joint inventor contributed to an invention's conception?

As a threshold matter, Defendants' argument was that in a complaint, a plaintiff must set out the joint inventor's contributions on a "'claim-by-claim basis.'" (D.I. 45 at 2 (citation omitted); *see also* D.I. 30 at 10; Tr. at 157, 159-60) One could read this as an assertion that, in order to plead a claim for joint inventorship under Section 256, the plaintiff has to list out every claim found in every patent-at-issue and inform the reader, on a "claim-by-claim basis," whether the purported co-inventor contributed something significant to each one of those claims (and if so, how). If that is what Defendants mean by "claim-by-claim basis," then the Court disagrees that this level of specificity is required. [11]

On the other hand, the Court does agree with Defendants that in order to sufficiently plead a Section 256 joint inventorship claim, with respect to the nature of the joint inventor's contribution, a plaintiff must: (1) identify at least one concept that is included *in at least one identified claim* of a patent-at-issue and then (2) allege some facts rendering it plausible that the purported co-inventor actually contributed (in a non-insignificant way) to at least that portion of the claimed invention. (Tr. at 148-50, 185) After all, in order to be a co-inventor, one has to contribute to the "*claimed* invention[.]" *Fina Oil*, 123 F.3d at 1473 (emphasis added); *see also*

---

[11] It is worth noting that Defendants lift this "claim-by-claim basis" phraseology from the United States Court of Appeals for the Federal Circuit's decision in *Trovan, Ltd. v. Sokymat SA, Irori*, 299 F.3d 1292 (Fed. Cir. 2002). (D.I. 45 at 2) It is true that, in *Trovan*, the Federal Circuit noted that "inventorship is determined on a claim-by-claim basis." *Trovan*, 299 F.3d at 1302. However, the *Trovan* Court was using this language simply to explain that in order to be a co-inventor on a patent, one need not make a contribution to the subject matter of *every claim* of a patent. *Id.* And importantly, in *Trovan*, the Federal Circuit was examining the district court's judgment regarding inventorship following a bench trial. *Id.* at 1294, 1300. Thus, the *Trovan* Court was clearly not making a point about pleading practice. Nor was it in any way assessing the sufficiency of inventorship allegations found in a complaint.

*Eastman v. Apple, Inc.*, Case No. 18-cv-05929-JST, 2019 WL 1559015, at *3 (N.D. Cal. Apr. 10,

2019); *Beco Dairy Automation, Inc. v. Glob. Tech. Sys., Inc.*, No. 1:12-cv-01310 LJO SMS, 2015

WL 925588, at *5 (E.D. Cal. Mar. 3, 2015).  And if a complaint fails to allege sufficient facts for

a court to understand how the purported co-inventor actually contributed to a concept that *ended*

*up in at least one identified claim of a patent*, then how can the court conclude that a co-

inventorship claim is plausible as to that patent?  *See Beco Dairy Automation, Inc.*, 2015 WL

925588, at *5 (concluding that a plaintiff did not plausibly allege that a person ("Lininger") was

a joint inventor as to certain patents at issue, because although it was alleged that "it was

Lininger's idea to add an additional metal ring to [an] existing flow meter" the plaintiff "fail[ed]

to tie this work to any of the patents at issue" in that the "Court cannot tell from [passages cited

by the plaintiff] how Lininger's three-ring concept even applies to [a cited patent]"). [12]

There are some instances in the Complaint where Illumina does sufficiently identify

certain concepts and then explains how those concepts are found in at least one claim of certain

patents-at-issue.  Thus, the Court can understand how it is that at least these

concepts/claims/patents are assertedly relevant to Illumina's co-inventorship claim regarding

Eltoukhy.  For example, in paragraphs 93-95, the Complaint calls out one limitation apiece in

---

[12]        *See also Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 1:11-cv-01273 LJO
BAM, 2012 WL 691758, at *3 (E.D. Cal. Mar. 2, 2012) (concluding that a plaintiff had pleaded
a plausible correction of inventorship claim under Section 256, where it had identified the
relevant concept covered by the patent claims at issue ("the configuration of eight side columns
and an upper portion, which is recessed, in contrast with a lower portion, which has a doubling of
material"), and then pleaded facts as to how an alleged co-inventor provided the initial design as
to that configuration) (internal quotation marks and citation omitted); *St. Joseph Sols., LLC v.
Microtek Med., Inc.*, No. 1:11-cv-388, 2011 WL 5914010, at *12 (S.D. Ohio Nov. 28, 2011)
(concluding the same, where the plaintiff pleaded facts explaining that a claim in a patent-at-
issue was directed to connected sleeves that were separated from one another via at least one line
of perforations, and also explained how the purported co-inventor had contributed to that
concept).

claim 10 of the '743 patent, claim 24 of the '995 patent, claim 1 of the '731 patent, claim 1 of the '810 patent, claim 20 of the '880 patent, claim 23 of the '152 patent and claim 2 of the '858 patent, and then asserts that Eltoukhy contributed to the conception and reduction to practice of these claims while he was at Illumina.  (D.I. 1 at ¶¶ 93-95; D.I. 41 at 17)  And in paragraph 58, the Complaint seems to focus on claim 1 of the '731 patent's element of "grouping sequence reads into families, and then collapsing those reads into a single consensus sequence from the sequence reads in the families."  (D.I. 1 at ¶ 58)[13]

However, the dispositive problem with the inventorship claim relating to Eltoukhy is that the Complaint does not contain facts making it plausible that *Eltoukhy himself did in fact contribute to or conceive of* the above-listed concepts found in the above-referenced patent claims.  (D.I. 30 at 10-11; D.I. 45 at 2 ("Like its complaint, Illumina's opposition says Dr.

---

[13]    The Court notes that in paragraphs 54-56, the Complaint alleges that in December 2012, Eltoukhy e-mailed certain "draft patent claims" to his personal Gmail account, and then it lists out certain elements of those draft claims.  (D.I. 1 at ¶¶ 55-56)  But in these paragraphs, Illumina never specifies which claims of which of the 35 patents at issue these elements are actually relevant to.  (Tr. at 183)  Similarly, in paragraph 51, the Complaint alleges that the "Guardant patents disclose and claim" certain concepts.  (D.I. 1 at ¶ 51)  But the Complaint never articulates what claims of which of the 35 patents incorporate these concepts.  As a result, the Court will not consider these vague allegations further here.

The Court also sees that one of the elements referenced in one of the claims Eltoukhy purportedly drafted, pursuant to the allegations in paragraph 56 ("sequencing extracellular polynucleotides from a bodily sample from a subject, wherein each of the extracellular polynucleotide[s] are optionally attached to multiple barcodes") reads somewhat similarly to the element of claim 10 of the '743 patent that Eltoukhy is said to have "contributed to[,]" pursuant to the allegations in paragraph 93 ("sequencing extracellular polynucelotides from a bodily sample and mapping sequence reads derived from the sequencing onto a reference sequence").  (*Id.* at ¶¶ 56, 93)  But that just raises the question:  Are these two allegations meant to be linked?  In other words, did Illumina mean to allege that Eltoukhy drafted what became an element in claim 10 of the '743 patent?  If Illumina was intending this, it surely could have made that linkage explicit in the Complaint.  In the absence of such an effort, the Court is not going to guess or speculate at what Plaintiff's allegations in this regard are meant to convey.

Eltoukhy 'contributed to the conception and reduction to practice' of certain claim elements, but Illumina never alleges facts to support that bare conclusion."); Tr. at 179-80)  With regard to the allegations in paragraphs 93-95, those paragraphs simply allege, in a conclusory manner, that Eltoukhy "contributed" to the listed concepts at issue.  But the Complaint points to no factual allegations that would actually render these assertions plausible.  (*See, e.g.*, D.I. 1 at ¶¶ 93-95; *see also* D.I. 45 at 2)  With regard to the allegations in paragraphs 58, as the Court noted above, *see supra* n.7, the Complaint means to allege that this grouping/collapsing concept was contained in the communication theory slides that Steemers forwarded to Eltoukhy.  But the Complaint never clearly asserts how, thereafter, Eltoukhy actually contributed to that concept—such that he should be named as a joint inventor with regard to patents that include the concept.  (D.I. 30 at 11; Tr. at 168)  For this reason, the Court agrees with Defendants that Illumina's inventorship claim as to Eltoukhy is insufficiently pleaded, and recommends that it be dismissed.  *See Eastman*, 2019 WL 1559015, at *3 (explaining that a plaintiff had not plausibly pleaded a Section 256 claim as to his own co-inventorship because although he "copie[d] the claim language from numerous claims into his complaint" he had "identifie[d] no relationship between his notes and the claims themselves[,]" and in his briefing had "merely identifie[d] similarities between [the plaintiff's] notes and the figures in the patents, rather than the claims that allegedly entitle him to inventorship"); *see also Ecojet, Inc. v. Pure Spa Components, Inc.*, Case No.: SACV 16-01463-CJC(KESx), 2017 WL 3485780, at *5 (C.D. Cal. Feb. 10, 2017). [14]

> ### b.   Has Illumina Pleaded an Actionable Trade Secret Misappropriation Claim?

---

[14]     In light of this conclusion, the Court need not address Defendants' additional arguments relating to, *inter alia*, collaboration and ownership with regard to Eltoukhy.  (D.I. 30 at 11-15)  But Illumina would be wise to shore up its allegations on these fronts in any amended pleading asserting an inventorship claim with respect to Eltoukhy.

To state a claim for misappropriation of trade secrets under the CUTSA, a plaintiff must sufficiently allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Genasys Inc. v. Vector Acoustics, LLC*, — F. Supp. 3d — , 2022 WL 16577872, at *8 (S.D. Cal. Nov. 1, 2022) (internal quotation marks and citation omitted). [15]   Further, a plaintiff must describe the subject matter of the trade secret "with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Acrisure of Cal., LLC v. SoCal Com. Ins. Servs., Inc.*, Case No.: CV 18-10187-CJC(ADSx), 2019 WL 4137618, at *3 (C.D. Cal. Mar. 27, 2019) (internal quotation marks and citations omitted).   Even so, courts have also noted that "a plaintiff need not spell out the details of the trade secret." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018) (internal quotation marks and citations omitted).

Defendants assert that Illumina's misappropriation of trade secrets claim is deficient for two main reasons.  First, Defendants argue that Illumina fails to identify its trade secrets with reasonable particularity.  (D.I. 30 at 17-19; D.I. 45 at 6-7)  Second, Defendants contend that, to the extent that Illumina has identified any trade secrets with particularity, Illumina's claim is nevertheless time-barred.  (D.I. 30 at 19-21; D.I. 45 at 7)  The Court will take up these issues in turn.

---

[15]     Under the CUTSA, a "trade secret" is information that:  "(1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).

i.      Has Illumina identified its trade secrets with
               particularity?

Count II of Illumina's Complaint references two examples of Illumina's trade secret

information purportedly misappropriated by Defendants:  (1) the communication theory slides

that Steemers provided to Eltoukhy, which included "proprietary and confidential concepts for

improving error rates for random encoding using barcodes for use in genetic sequencing[;]" and

(2) the 51,000 documents that Eltoukhy took from Illumina, which contained "trade secret

information[.]"  (D.I. 1 at ¶¶ 105-06; *see also* Tr. at 86-87)  Earlier allegations in the Complaint

provide a bit more detail regarding these two examples.  With respect to the communication

theory slides, the Complaint further alleges:

> 57.  Materials that Eltoukhy obtained from Illumina employees
> included, by way of example, Illumina's confidential and
> proprietary error correction methods and communication theory
> ideas, including methods for grouping sequence reads into families
> and then collapsing those reads into a single consensus sequence
> from the sequence reads in the families.  Eltoukhy and Talasaz
> used this information in Guardant patent applications and claims,
> including in systems and methods to detect rare mutations and
> copy number variations.

(D.I. 1 at ¶ 57; *see also supra* n.7)  As for the 51,000 documents, the Complaint alleges:

> 65.  When Eltoukhy left Illumina, he took with him, without
> authority or permission, more than 51,000 Illumina-owned emails.
>
> 66.  The emails that Eltoukhy took from Illumina included more
> than 1,400 documents specifically labeled "COMPANY
> CONFIDENTIAL—INTERNAL USE ONLY."

(D.I. 1 at ¶¶ 65-66)

Taking up the 51,000 documents first, the Court easily agrees with Defendants that no

claim has been stated.  This bald reference to an incredibly expansive amount of material does

not suffice to "permit the defendant to ascertain at least the boundaries" of any trade secrets said

to have been misappropriated. *Acrisure of Cal., LLC*, 2019 WL 4137618, at *3; *see also Synopsys, Inc. v. ATopTech, Inc.*, Case No. C 13-cv-02965 SC, 2013 WL 5770542, at *6 (N.D. Cal. Oct. 24, 2013) ("[A plaintiff's] vague references to an enormous array of potential sources [as containing its misappropriated trade secrets] do not suffice to survive Defendant's motion to dismiss."); (Tr. at 88). [16]

The Court turns next to the information set out in the communication theory slides, which is (at least in part) specifically described in the latter portion of paragraph 57 (i.e., "methods for grouping sequence reads into families and then collapsing those reads into a single consensus sequence from the sequence reads in the families"). (D.I. 1 at ¶ 57) During oral argument, Illumina's counsel acknowledged that this is the most specific articulation of a category of trade secrets in the Complaint—indeed, that it is the only *specific* category of trade secrets set out therein. (Tr. at 80-81, 91-93; *see also* D.I. 41 at 23) Other allegations in the Complaint include slightly broader references to this category of trade secrets and also indicate that it is referenced in the communication theory slides. (*See, e.g.*, D.I. 1 at ¶ 41 (alleging that Eltoukhy requested the slide presentation from Steemers containing confidential Illumina information "concerning random coding improvement in error rate for use in genetic sequencing to obtain better accuracy from fewer sequence reads"))

---

[16] To the extent that Illumina suggests that the decision of the United States Court of Appeals for the Third Circuit in *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021) allows for a plaintiff to broadly cite to thousands of documents—with no further indication of what is contained in those documents—in order to satisfy the requirement that a trade secret be identified with particularity, (D.I. 41 at 22; Tr. at 110-13), the Court does not agree, (*see* Tr. at 66, 132). In that case, the plaintiff had described its trade secrets with specificity, and had attached certain documents that specified in detail particular trade secrets at issue. *Oakwood*, 999 F.3d at 907. Illumina has done no such thing with respect to the 51,000 documents it cites in the Complaint.

The Court concludes that Illumina has identified this particular category of trade secrets —i.e., those relating to using "methods for grouping sequence reads into families and then collapsing those reads into a single consensus sequence from the sequence reads in the families" in the relevant context—with sufficient particularity.  Here the Complaint describes the particular method at issue, and further identifies specific documents that purportedly disclose the trade secret.  This suffices to put Defendants on notice with respect to "at least the boundaries within which the secret lies."  *See, e.g.*, *HotSpot Therapeutics, Inc. v. Nurix Therapeutics, Inc.*, Case No. 22-cv-04109-TSH, 2022 WL 16637988, at *4 (N.D. Cal. Nov. 2, 2022) (finding that the plaintiff's complaint identified its trade secrets with sufficient particularity, where it set out the subject matter in question (E3 ubiquitin ligases, DELs, certain identified software, and confidential information found in a particular agreement)). [17]

Therefore, the Court recommends that the Motion be granted with respect to Illumina's trade secret claim on insufficiency-of-pleading grounds, with the exception of the category of

---

[17]    Defendants also argue in their opening brief (in a single sentence) that Illumina has failed to allege how the purported trade secrets derive independent economic value or whether they were subject to reasonable measures to maintain their secrecy. (D.I. 30 at 18-19; *see also* Tr. at 64)  The Court is not persuaded. (*See* D.I. 41 at 23; Tr. at 104-06)  The Complaint alleges that:  (1) Illumina has "invested substantial resources in research and development, including related to methods for improving error rates for random encoding using barcodes for use in genetic sequencing[;]" and (2) Illumina employs "stringent security measures to preserve the secrecy of its trade secrets, including by requiring employees to sign various agreements and company policies and to return any Illumina information in their possession upon termination of employment." (D.I. 1 at ¶¶ 107, 109)  This is sufficient to satisfy these requirements at the pleading stage. *See, e.g.*, *Moement, Inc. v. Groomore, Inc.*, Case No. 2:22-cv-02871-MWF (JEMx), 2022 WL 18284405, at *6 (C.D. Cal. Nov. 29, 2022) ("Courts have found that requiring employees to sign confidentiality agreements respecting its trade secrets is a sufficiently reasonable step to ensure the secrecy of their information."); *Heska Corp. v. Qorvo US, Inc.*, 1:19CV1108, 2020 WL 5821078, at *6 (M.D.N.C. Sept. 30, 2020) (finding that the plaintiff sufficiently alleged facts indicating that the trade secret produced some form of economic value, where the complaint asserted that, *inter alia*, the plaintiff expended $500,000 on research and development of the instrument product).

trade secrets described in the latter portion of paragraph 57 of the Complaint.[18]  As to that

surviving aspect of Count II, the Court now considers whether the claim is nevertheless time-

barred.

### ii.     Is Illumina's trade secret claim time-barred?

Defendants argue that the category of trade secrets identified in paragraph 57

demonstrates that Illumina's claim comes years too late.  This is purportedly because the same

information was used by Eltoukhy and Talasaz in patent applications filed in 2015 and 2016—

applications that later issued as patents in 2017 and 2018.  (D.I. 30 at 19-20; *see also* D.I. 1 at ¶¶

50, 57)  Thus, Defendants argue, Illumina has been on constructive notice of any

misappropriation since then, and its claims are time-barred.  (D.I. 30 at 20)[19]

Trade secret misappropriation claims brought under CUTSA are subject to a three-year

statute of limitations, Cal. Civ. Code § 3426.6, which begins to run when there is actual or

constructive notice of a claim, *Wang v. Palo Alto Networks, Inc.*, No. C 121-05579 WHA, 2014

WL 1410346, at *5 (N.D. Cal. Apr. 11, 2014).  To that end, a trade secret misappropriation claim

does not accrue "until the plaintiff discovers, or has reason to discover," the underlying facts.

---

[18]     The parties suggested that there could be future disputes relating to the scope of
discovery with respect to Illumina's surviving trade secret claim.  (*See* Tr. at 96-99, 133-37)  The
parties may utilize the Court's discovery dispute procedures to the extent that any such disputes
materialize.  That said, the parties should be mindful of the guidance that the Court has set out in
*Boston Sci. Corp. v. Nevro Corp.*, Civil Action No. 16-1163-CFC-CJB, 2020 WL 5095447, at
*6-7 (D. Del. Aug. 21, 2020) regarding the appropriate scope of trade secret discovery.

[19]     In raising this argument, Defendants are asserting that the applicability of an
affirmative defense should lead to dismissal of this claim, pursuant to Rule 12(b)(6).  (Tr. at 20)
A district court may dismiss a claim on the basis of the applicability of an affirmative defense.
But it may do so only if the defense is evident from the face of the complaint at issue and no
development of the factual record is required to determine whether dismissal is appropriate.
*ECB USA, Inc. v. Savencia, S.A.*, Civil Action No. 19-731-RGA-CJB, 2020 WL 11762200, at
*12 n.14 (D. Del. July 10, 2020), *report and recommendation adopted*, 2020 WL 5369076 (D.
Del. Sep. 8, 2020).

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1217 (N.D. Cal.

2012), *on reconsideration in part*, 2012 WL 12925716 (N.D. Cal. July 8, 2012).  In order to rely

on the discovery rule for delayed accrual of a cause of action, a plaintiff whose complaint

otherwise demonstrates on its face that its claim would be time-barred must specifically plead

facts showing:  (1) the time and manner of discovery; and (2) the inability to have made earlier

discovery notwithstanding the plaintiff's reasonable diligence.  *Wolf v. Travolta*, No. 2:14-CV-

938-CAS (VBKx), 2014 WL 6685560, at *7 (C.D. Cal. Nov. 24, 2014).

Illumina contends that, as detailed in its Complaint, it did not discover any of the

misappropriation until at least June 2019, when it responded to discovery requests in the FMI

litigation; this was less than three years before Illumina filed suit in March 2022.  (D.I. 41 at 6-7

(citing D.I. 1 at ¶¶ 75-78))  In support of this assertion, Illumina argues that:  (1) the

patents/applications do not on their face flatly reveal Defendants' misappropriation; and (2) even

if they did, Defendants' fraudulent concealment of the misappropriation tolled the relevant

statute of limitations.  (*Id.* at 7-8; Tr. at 72-73)  The doctrine of fraudulent concealment "tolls the

statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow

stale."  *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (Cal. 2013).  In order to

sufficiently allege the applicability of the doctrine of fraudulent concealment, a plaintiff must

plead "(1) knowledge of the true facts by the party to be estopped, (2) intent to induce reliance or

actions giving rise to a belief in that intent, (3) ignorance of the true facts by the relying party,

and (4) detrimental reliance."  *IQVIA Inc. v. MedImpact Healthcare Sys., Inc.*, Case No. 21-CV-

2081-GPC-DEB, 2022 WL 1125779, at *4 (S.D. Cal. Apr. 15, 2022) (internal quotation marks

and citations omitted).  A claim of fraudulent concealment must satisfy Federal Rule of Civil

Procedure 9(b)'s heightened pleading requirements.  *Thibodeaux v. Teamsters Loc. 853*, 263 F. Supp. 3d 772, 778 (N.D. Cal. 2017).

At this early juncture, the Complaint's surviving trade secret misappropriation allegations are sufficient to escape Defendants' statute of limitations defense.  *Cf. S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) ("When the applicability of the statute of limitations is in dispute, there are usually factual questions as to when a plaintiff discovered or should have discovered the elements of its cause of action, and thus defendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are [time] barred.") (internal quotation marks and citation omitted).  Despite any suggestion by Defendants to the contrary, there is not a *per se* rule that if a patent application or patent issues and it contains misappropriated trade secrets, then this starts the statute of limitations clock ticking in every case.  And here, it is not clear (based on the allegations of the Complaint) that even if Illumina were on notice of the content of these patents/applications when they issued, it would have had reasonable suspicion that the alleged misappropriation had occurred.  It also seems plausible—again, at least at this early stage, with only the Complaint's allegations to guide us—that Illumina might have reasonably believed that its trade secrets ended up in the patents/applications through independent discovery on the part of Talasaz and/or Eltoukhy.  (Tr. at 117-18, 120-21); *cf. Gen. Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1396, 1398 (9th Cir. 1991) (reversing the district court's decision at summary judgment that, as to a California state fraud claim, the statute of limitations had run; the court did so in light of the plaintiff's argument that the issuance of a patent did not constitute constructive notice of the plaintiff's claims against the defendants, because "Brandau's name was not on the patent, a[nd so

24

a] reasonable person might not infer from the patent's existence that fraud had occurred" and "[t]he patent could instead be the result of an independent discovery by" the defendant).

Moreover, the Complaint alleges a number of facts that sufficiently demonstrate the applicability of the doctrine of fraudulent concealment. These allegations include that, *inter alia*: (1) the Individual Defendants anonymously incorporated Guardant while still employed at Illumina in December 2011; (2) Talasaz left employment at Illumina in June 2012; (3) Eltoukhy concealed that he was working for Guardant while still employed by Illumina, including by failing to tell Steemers that he was requesting the communication theory slides for non-Illumina related work; (4) Eltoukhy used his personal e-mail address to transmit Illumina's confidential information to Guardant; (5) Eltoukhy took 51,000 documents from Illumina without permission; and (6) Guardant removed Eltoukhy as a named inventor from certain patent applications before they issued as patents. (D.I. 1 at ¶¶ 26, 28, 39, 45, 50, 55, 65, 69, 72-74) Defendants' alleged deception could in turn have prevented Illumina from discovering the misappropriation. It might, for example, have helped lull Illumina into believing that Talasaz and/or Eltoukhy were not a threat to Illumina's innovation efforts—and that Talasaz and/or Eltoukhy might have independently discovered the material later disclosed in these patents/applications. (D.I. 41 at 8-9; Tr. at 25, 74, 117)

Therefore, after construing the allegations in the light most favorable to Illumina, it is plausible that it was not able to discover Defendants' alleged misappropriation until a time period within the relevant statute of limitations—particularly in light of Defendants' alleged fraudulent concealment of key facts. *Cf. Keith Mfg., Co. v. Butterfield*, Case No. 3:15-cv-2008-SI, 2016 WL 4134555, at *11 (D. Or. Aug. 2, 2016) ("Keith's inability to discover the misappropriation may have resulted from Butterfield's fraudulent concealment of when he

developed the patent design and Loadbacker business.  Butterfield is free to present factual evidence to the contrary at summary judgment or trial.").

### c.    Has Illumina Pleaded Actionable Breach of Contract Claims?

In Counts III and IV of the Complaint, Illumina alleges breach of contract claims against the Individual Defendants.  (D.I. 1 at ¶¶ 121-42)  But the Complaint does not attach copies of the relevant contracts.  Nor does it expressly lay out the specific provisions of such contracts that were allegedly breached.

Instead, the Complaint alleges:

> 18.  As part of their employment with Illumina, Eltoukhy and Talasaz entered into and agreed to employment contracts and company policies, including a Proprietary Information and Invention Agreement ("PIIA"), Confidentiality – Disclosure on Need-To-Know Basis Only Acknowledgement ("Confidentiality Acknowledgement"), Code of Ethics, and, at the end of their employment, a Termination Certificate.

> 19.  The employment agreements and company policies to which Eltoukhy and Talasaz agreed required them to devote their efforts to Illumina's business, to not compete with Illumina, to avoid conflicts of interest that could compromise their loyalty to Illumina, to assign to Illumina their inventions made while employed by Illumina that are related to Illumina's business, to protect Illumina's confidential and proprietary information, to not take or use Illumina's resources and property for their personal benefit, and to return Illumina materials to the company upon termination of their employment. . . .

> 125.  Eltoukhy materially breached the PIIA, the Confidentiality Acknowledgement, and Code of Ethics, respectively, in numerous ways and at numerous times, including for example but without limitation:  Eltoukhy's efforts (with Talasaz) to incorporate Guardant in 2011; Eltoukhy's acting as an advisor, corporate agent, and fiduciary of Guardant while employed by Illumina; Eltoukhy's forwarding of Illumina confidential and proprietary information outside of Illumina and to non-Illumina employees; Eltoukhy's transfer outside Illumina, including to Guardant, of thousands of Illumina proprietary documents, including more than 1,400 "COMPANY CONFIDENTIAL" documents, when he

separated from Illumina in January 2013; and Eltoukhy's contribution to the development of Guardant's technology while an employee of Illumina, including by using proprietary information provided by other Illumina personnel and drafting patent claims ultimately obtained in Guardant's name. These actions, among others, violate at least Sections 3(a), 3(b), 3(c), 3(d), 3(e), 3(h), and 3(i) of the PIIA, Paragraphs 2, 4, 5, and 9 of the Confidentiality Acknowledgement, and Sections 1 and 4 of the Code of Ethics.

126. Eltoukhy's knowing and willful misappropriation of Illumina's trade secrets also violates and breaches at least Paragraphs 1, 2, and 3 of the Illumina Termination Certificate that he signed when he separated from Illumina in January 2013. . . .

136. Talasaz materially breached the PIIA, the Confidentiality Acknowledgement, and Code of Ethics, respectively, in numerous ways and at numerous times, including for example but without limitation: Talasaz's efforts (with Eltoukhy) to incorporate Guardant in 2011; and Talasaz knowingly receiving Illumina confidential and proprietary information from Eltoukhy and using the same to develop Guardant's technology and intellectual property. These actions, among others, violate at least Sections 3(a), 3(b), 3(c), 3(d), 3(e), 3(h), and 3(i) of the PIIA, Paragraphs 2, 4, 5, and 9 of the Confidentiality Acknowledgement, and Sections 1 and 4 of the Code of Ethics.

137. Talasaz's knowing and willful misappropriation of Illumina's trade secrets also violates and breaches at least Paragraphs 1, 2, and 3 of the Illumina Termination Certificate that he signed when he separated from Illumina.

(*Id.* at ¶¶ 18-19, 125-26, 136-37)

Under California law, a plaintiff bringing a breach of contract claim must either "attach a copy of the contract to the complaint or plead the essential terms of the contract." *Gross v. Symantec Corp.*, No. C 12-00154 CRB, 2012 WL 3116158, at *11 (N.D. Cal. July 31, 2012); *see also Langan v. United Servs. Auto. Ass'n*, 69 F. Supp. 3d 965, 979 (N.D. Cal. 2014) (citing California law to this effect).[20] Defendants assert that Illumina's breach of contract claims are

---

[20]    Although Illumina's Complaint does not specify what state's law applies to its breach of contract claims, its briefing suggests that California law applies. (D.I. 41 at 24-25; Tr.

insufficiently pleaded because the Complaint fails to identify the essential terms of any contract allegedly breached by the Individual Defendants.  (D.I. 30 at 23-24; D.I. 45 at 8)  Instead, according to Defendants, the allegations leave it "undefined and open-ended" as to (1) which conduct is said to have breached (2) which provisions of (3) which contract at issue.  (Tr. at 205-06)  The Court agrees with Defendants.

While paragraph 19 of the Complaint makes reference to the substance of the key contractual provisions at issue, it does not specify the wording of those provisions.  Instead, it just summarizes the provisions in a fairly broad manner.  (D.I. 1 at ¶ 19)  This gives the Court some pause, because it makes it harder to assess whether certain challenged conduct plausibly amounts to a breach of the actual contract requirements at issue.

But even if the Court were to look past that problem, more troublesome is that paragraph 19 fails to indicate which of the contracts at issue contain which of these allegedly-breached provisions.  (*Id.*; Tr. at 215-16, 219)  From there, paragraphs 125 and 136 broadly set out exemplary conduct at issue that, "among other[]" unspecified actions, is said to violate "at least" certain provisions of the PIIA, Confidentiality Acknowledgement and Code of Ethics.  (D.I. 1 at ¶¶ 125, 136)  And while paragraphs 126 and 137 identify expansive conduct said to violate "at least" certain provisions of the relevant Termination Certificates, the Complaint never makes clear what the essential terms of those provisions are.  (*Id.* at ¶¶ 126, 137)  This lack of clarity leaves the reader unsure of exactly what conduct of the Individual Defendants is said to breach which provision of which particular contract referenced in the Complaint.  In light of this opaqueness, the Court recommends that the breach of contract claims be dismissed.  *See, e.g.*,

---

at 214-15)  Defendants also rely on California law, and so that is the law that the Court will utilize here.  (D.I. 30 at 23-24)

*AK Futures LLC v. LCF Labs Inc.*, Case No. 8:21-cv-02121-JVS (ADSx), 2022 WL 2784409, at

*4 (C.D. Cal. June 24, 2022) (finding that the complaint did not provide defendants with

sufficient notice of a breach of contract claim where, *inter alia*, "it is unclear which agreement

includes which terms"); *Redmond v. United States*, Case No. 22-cv-01107-TSH, 2022 WL

3137925, at *3-4 (N.D. Cal. June 13, 2022) (finding that the complaint failed to "sufficiently

provide the essential terms of a contract" where it did not include the contract itself and simply

references "a non-disclosure agreement . . . made between Plaintiff and DOE (Sandia) under

Contract Number DE-AC04-94AL85000 with respect to Plaintiff's proprietary fuel cell

chemistry and technology") (internal quotation marks and citation omitted). [21]

**B.      Defendants' Argument for Dismissal Pursuant to Rule 12(b)(2)**

Finally, Defendants argue that Illumina's claims for misappropriation of trade secrets and

breach of contract against the Individual Defendants must also be dismissed for lack of personal

jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).  (D.I. 30 at 24-25; D.I. 45 at 9-

10)  Below, the Court will first set out the legal standard regarding a Rule 12(b)(2) challenge.

Then it will turn to the merits.

**1.      Legal Standard**

---

[21]     Defendants also argue that Illumina's breach of contract claims are barred by California's four-year statute of limitations, because the alleged breaches were reasonably discoverable through publicly available information.  (D.I. 30 at 21-23; D.I. 45 at 8-9)  Illumina retorts that the breach of contract claims are timely because, due to Defendants' acts of fraudulent concealment, they did not accrue until Illumina discovered the breaches in or around June 2019 and thereafter.  (D.I. 41 at 9-10)  However, as the Court has explained above, the current allegations do not provide sufficient notice with respect to which provisions of which contracts were breached by which activity.  And without the necessary understanding of the breach of contract claims, the Court cannot in turn assess the parties' arguments as to when these claims began to accrue.

Rule 12(b)(2) directs courts to dismiss a case when the court lacks personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). When a defendant moves to dismiss a lawsuit for lack of personal jurisdiction, the plaintiff bears the burden of showing the basis for jurisdiction. *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp. 2d 365, 369 (D. Del. 2008). In a case like this one, where a district court has not held an evidentiary hearing, the plaintiff must only make a *prima facie* showing that personal jurisdiction exists. *See Perlight Solar Co. Ltd. v. Perlight Sales N. Am. LLC*, C.A. No. 14-331-LPS, 2015 WL 5544966, at *2 (D. Del. Sept. 18, 2015); *Hardwire, LLC v. Zero Int'l, Inc.*, Civil Action No. 14-54-LPS-CJB, 2014 WL 5144610, at *5 (D. Del. Oct. 14, 2014). To do so, the plaintiff must establish with reasonable particularity sufficient contacts between the defendant and the forum state. *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992). All factual inferences to be drawn from the pleadings, affidavits and exhibits must be drawn in the plaintiff's favor at this stage. *Hardwire*, 2014 WL 5144610, at *5 (citing cases); *Power Integrations*, 547 F. Supp. 2d at 369.

In order to establish personal jurisdiction, a plaintiff typically must adduce facts sufficient to satisfy two requirements—one statutory and one constitutional. *Perlight Solar*, 2015 WL 5544966, at *2; *Hardwire*, 2014 WL 5144610, at *6. First, the Court must consider whether there is a basis for exercising personal jurisdiction pursuant to Delaware state law. *See Hardwire*, 2014 WL 5144610, at *6; *see also Power Integrations*, 547 F. Supp. 2d at 369. Second, the Court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *Hardwire*, 2014 WL 5144610, at *6; *Power Integrations*, 547 F. Supp. 2d at 369 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Due process is satisfied where the court finds that "certain minimum contacts" exist between the defendant

and the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316 (internal quotation marks and citations omitted).

### 2.    Discussion

With regard to the statutory basis for jurisdiction, Illumina asserts that this Court has personal jurisdiction over the Individual Defendants, who are officers of Guardant—a Delaware corporation—pursuant to, *inter alia*, Del. Code tit. 10, § 3114, the nondirector officer and consent statute ("Section 3114").  (D.I. 41 at 11-15; *see also* D.I. 1 at ¶ 15)[22]  Illumina's Complaint further alleges with respect to this issue:

> 15. This Court has personal jurisdiction over Defendants. . . .
> Eltoukhy and Talasaz incorporated Guardant in Delaware, and did
> so while employed by Illumina.  Eltoukhy and Talasaz founded
> Guardant based on misappropriated confidential information from
> Illumina and assigned the patents at issue in this action to
> Guardant, a Delaware corporation.  Defendants have filed and
> participated in patent litigation in Delaware, including [the FMI
> litigation].  Those cases involved patents at issue in this action.
> Defendants Eltoukhy and Talasaz are directors and officers of
> Guardant[.]

(D.I. 1 at ¶ 15)

Defendants do not dispute that Illumina has pleaded a statutory basis for jurisdiction under Section 3114.  (D.I. 45 at 9-10; Tr. at 226-27)  Instead, the issue in dispute is whether the Court's exercise of jurisdiction would comport with due process.  (D.I. 45 at 9-10; Tr. at 226-27)

---

[22]    Section 3114 provides a statutory basis for personal jurisdiction over non-resident directors of Delaware corporations in:  (1) "all civil actions or proceedings brought in [Delaware] . . . against such corporation, in which such officer is a necessary or proper party[;]" or (2) "in any action or proceeding against such officer for violation of a duty in such capacity[.]"  Del. Code tit. 10, § 3114(b); *see also Hazout v. Tsang Mun Ting*, 134 A.3d 274, 277 (Del. 2016).

On that front, Illumina contends that personal jurisdiction over the Individual Defendants is consistent with due process because they "served as directors and officers of a Delaware corporation; indeed, as founders, they *chose* to incorporate in Delaware[,]" thus purposefully availing themselves of certain duties and protections under Delaware law, such that they should reasonably anticipate being sued in Delaware.  (D.I. 41 at 14-15 (emphasis in original) (citing *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 292 (Del. 2016); *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005)).  Meanwhile, Defendants contend that courts have repeatedly held that serving as officers and directors of a Delaware corporation and choosing to incorporate in Delaware is insufficient, in and of itself, to satisfy the due process prong of the personal jurisdiction inquiry.  (D.I. 45 at 10; Tr. at 236-37)

The Court next turns to relevant caselaw.  In *Hazout v. Tsang Mun Ting*, 134 A.3d 274 (Del. 2016), the Supreme Court of Delaware explained that utilizing a minimum contacts due process analysis following application of Section 3114 helps to ensure that the statute is not applied too broadly.  *Hazout*, 134 A.3d at 288, 291.  As an example, the *Hazout* Court posited a hypothetical.  It explained that if plaintiffs sued officers and directors of a Delaware corporation in a products liability case where the products at issue were designed and distributed outside of Delaware to non-residents, then the minimum contacts test would "provide substantial protection" to those defendants.  *Id.* at 291 n.60.  That is because even if Section 3114 would be satisfied in such a case, subsequent application of the minimum contacts test would prevent Delaware from exercising personal jurisdiction:

> [W]he[re] Delaware's status as the state of incorporation had no rational connection to the cause of action, where the conduct is governed by the laws of other states, and where there is no reason why a corporate fiduciary should expect to be named as a party at all, much less in a suit where the underlying conduct and claims

32

> have no rational connection to Delaware and provide no rational
> basis for Delaware to apply its own law.

*Id.*

In *Hazout*, the plaintiff sued the CEO of a Delaware corporation based in Canada; the CEO resided in Canada.  *Id.* at 277.  Pursuant to a series of agreements specifying that Delaware law would govern, the plaintiff had lent the corporation money, which the CEO then diverted to another corporation that he controlled.  *Id.*  The CEO brought a motion to dismiss, asserting that there was no basis for a Delaware state court to exercise personal jurisdiction over him.  *Id.* After finding that Section 3114 applied, the *Hazout* Court concluded that the due process analysis was easily satisfied, because:  (1) the CEO had purposefully availed himself of certain duties and protections under Delaware law by becoming the head of a Delaware corporation; and (2) the "conduct underlying all the claims was in fact Delaware-focused and involved parties using Delaware law as their language of commerce in negotiating the change of control of a Delaware corporation."  *Id.* at 289-90; *see also id.* at 292-93; *cf. AeroGlobal Cap. Mgmt.*, 871 A.2d at 440, 442 (finding that the due process requirement was satisfied where the defendant ("FIIB") executed with a Delaware corporation two stock purchase agreements calling for Delaware law to govern, had negotiated the agreements through its Delaware subsidiary, and where it was reasonable to infer that, by operating its Delaware subsidiary for commercial gain, FIIB benefited from Delaware law, such that Delaware had a legitimate interest in resolving the plaintiff's claims); *Papendick v. Bosch*, 410 A.2d 148, 152 (Del. 1979) (finding due process to be satisfied where the foreign defendant "came into the State of Delaware to create, under the Delaware Corporation Law, a subsidiary corporation for the purpose of implementing" the contract that was at issue in the lawsuit).

In contrast, in *BAM Int'l, LLC v. MSBA Grp. Inc.*, C.A. No. 2021-0181-SG, 2021 WL 5905878 (Del. Ch. Dec. 14, 2021), the Delaware Court of Chancery found that while Section 3114 was satisfied, the minimum contacts due process analysis was not.  It did so where the defendants were officers of a Delaware corporation that was headquartered in California, and: (1) the lawsuit did not involve the corporation's status as a Delaware corporation; (2) the contract at issue was a commercial one and the action did not implicate Delaware's corporate law; (3) the escrow account at issue was located in Utah and its funds would be distributed to a Malaysian supplier; (4) the harms alleged to have been committed did not implicate fiduciary duties or corporate governance practices; and (5) the tortious actions giving rise to the defendants' liability were not taken as officers of the corporation.  *BAM Int'l*, 2021 WL 5905878, at *10.  With "Delaware [having] no real interest" in the case, the Court concluded that the exercise of personal jurisdiction would not comport with due process.  *Id.* at *10-11; *see also, e.g.*, *Turf Nation, Inc. v. UBU Sports, Inc.*, C.A. No.: N17C-01-271 EMD CCLD, 2017 WL 4535970, at *9 (Del. Super. Ct. Oct. 11, 2017) (finding that even though Section 3114 may be satisfied, due process was not, where the plaintiff's claims were brought under the laws of states other than Delaware; the conduct giving rise to the claims occurred outside of Delaware and there were no claims that the individual defendant "misused his position" at the corporation; the Delaware corporations' principal places of business were outside of Delaware; and the agreement at issue called for the application of Georgia law).

Here, on the one hand, (1) both Illumina and Guardant are headquartered in California; (2) the Individual Defendants also reside there; (3) Illumina's trade secret misappropriation claims are brought under California law; (4) Illumina's breach of contract claims do not indicate what state's laws apply, though its briefing suggests that California law applies; and (5) the

conduct at issue took place in California.  (*See* D.I. 45 at 10; Tr. at 214-15, 236-37)  Yet on the other hand, the Complaint alleges that the Individual Defendants, while still employed at Illumina:  (1) took action to anonymously incorporate Guardant in here Delaware, and then, having created that Delaware corporate entity (2) improperly assigned the 35 patents at issue— patents that they allegedly obtained by misappropriating Illumina's confidential information—to Guardant.  (D.I. 1 at ¶¶ 2, 3, 15, 26; D.I. 41 at 13-14)

While it is not a clear-cut call, in the Court's view, Defendants have pleaded enough to satisfy the due process requirement.  This matter is different from the *Hazout* Court's products liability case hypothetical, as well as from the circumstances at play in cases like *BAM Int'l* and *Turf Nation* (cited above).  In all of those situations, the relevant entity's incorporation in Delaware bore no relation to the claims at issue—i.e., those entities were not formed, in Delaware, for the purpose of facilitating alleged wrongdoing.  In this case, however, like in the *AeroGlobal* and *Papendick* cases (also cited above), the allegations *do* have a tie to Delaware. Here, the Individual Defendants are alleged to have founded Guardant—and incorporated it in Delaware—at least partially for the purpose of enabling the corporation to wrongfully obtain various patents, which in turn could then be assigned to Guardant (instead of Illumina).  (Tr. at 238-42)  Thus, the Individual Defendants cannot fairly say that they "did not foresee that [they] would be subject to litigation in Delaware over [their] conduct" at issue here, and requiring them to defend Illumina's claims in Delaware would not "offend traditional notions of fair play and substantial justice."  *Hazout*, 134 A.3d at 293-94 (internal quotation marks and citation omitted).

For these reasons, the Court recommends that the Motion be denied as to the personal jurisdiction challenge.

III.    CONCLUSION

35

For the foregoing reasons, the Court recommends that the Motion be GRANTED-IN-PART and DENIED-IN-PART.  Specifically, it recommends that the Motion be GRANTED as to Illumina's inventorship claim and breach of contract claims; GRANTED with respect to Illumina's trade secret misappropriation claim, with the exception of the portion of the claim relating to the category of trade secrets described in the latter part of paragraph 57 of the Complaint (i.e., "grouping sequence reads . . ."); and DENIED with respect to the assertion that there is no personal jurisdiction over the Individual Defendants.

Illumina requested leave to amend should the Court grant any portion of the Motion. (D.I. 41 at 25)  Because it is not clear to the Court that allowing the opportunity to amend would be a futile act, because this is the first time the Court has found any of Illumina's claims to be deficiently pleaded, and because leave to amend should be given freely "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court recommends that dismissal be without prejudice and that Illumina be given leave to file an amended complaint addressing the deficiencies outlined above.  The Court also recommends that if the District Court affirms its decision herein, Illumina be given no more than 30 days to file such an amended complaint.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  January 31, 2023

_Christopher J. Burke_
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE